## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | Case No. 3:16-CR-238-SRU |
| | ) | |
| v. | ) | |
| | ) | |
| CARLOS HERNANDEZ, | ) | NOVEMBER 6, 2019 |
| Defendant | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The Defendant, Carlos Hernandez, by and through counsel, respectfully submits this Memorandum in Aid of Sentencing. These remarks are addressed to what are anticipated to be the main issues and arguments presented to the court at sentencing. For the most part, this Memorandum will be a discussion of individual factors and circumstances that support the sentence that will be requested by the Defendant. We intend to rely upon the collective record in this case, which consists of the very thorough PSR prepared by U.S. Probation Officer Meghan Nagy, the evidence and information presented or available to the Court in the trial in this case, which case also involved co-defendants Francisco Betancourt, Lucilo Cabrera and Pascual Rodriguez.  We also intend to rely upon the record of previous post-*Booker* Sentencing Memoranda, filed in the District of Connecticut, which have exhaustively discussed the current, more flexible and individualized federal sentencing process.

At the outset, it will hopefully suffice to say that in this post-*Booker* era the sentencing court has greater latitude. *United States v. Booker,* 543 U.S. 220 (2005). The Court may now engage in what has been described as the art of sentencing rather than the science of sentencing. Id. at 226. See, e.g., *United States v. Bruno,* 789 F.3d 1249, 1254 (11th Cir. 2015) ("The decision about how much weight to assign a particular sentencing factor is 'committed to the sound

1

discretion of the district court.' [Citation omitted]."  A sentencing court is permitted to more freely consider mitigating factors and this Court will be asked to do so in this matter.

The Defendant has notified Probation that he does not agree with the guideline calculation of a life sentence.  The Defendant adopts that portion of co-defendant Betancourt's argument relating to the six-point ransom adjustment discussed in the Cabrera Sentencing Memorandum. The Defendant does not disagree with Probation's vulnerable victim adjustment and is aware of a number of precedents that support Probation's adjustment. See, *United States v. Sierra-Velasquez*, 310 F.3d 1217, 1220 (9th Cir. 2002) ("… aliens who want to enter this country illegally and are dependent on their smugglers for entry are more vulnerable than other categories of persons who may be held hostage for ransom."); also, *United States v. Mendoza*, 259 Fed. Appx. 987, 990 (9th Cir. 2007) (unpublished) (applying vulnerable victim enhancement where victims of defendant's hostage-taking were illegal immigrants); *United States v. Dock*, 293 F. Supp.2d 704, 713-14 (E.D. Texas, Nov. 12, 2003) (judgment vacated on other grounds); *United States v. Garza*, 429 F.\3d 165, 169 (5th Cir. 2005) (defendants concocted an immigration scheme through which they obtained money from undocumented immigrants by promising them immigration services).  At the sentencing hearing, the Defendant does not intend to belabor this relatively minor dispute of a guideline calculation.

As the Defendant advised Senior Probation Officer Nagy, he will primarily focus on the many factors in this case that warrant either a non-guidelines sentence or downward departures outside of the advisory guideline calculations. Under the particular atypical facts of this kidnapping/extortion case, and under the particular individual circumstances of this Defendant, the guidelines calculation overstates the seriousness of Carlos Hernandez's conduct. Nothing in the Memorandum should be construed as an attempt to ignore that the jury has spoken and that

the Defendant has been convicted of many of the charges of which he was originally accused, or interpreted to mean that the Defendant should not receive additional punishment. The Court and Government will hopefully concede that this particular defendant's conduct in these cases, his personal history and individual characteristics and background, when contrasted with each of his three co-defendants, warrant lesser punishment. The Defendant's relatively lesser involvement in these matters, his very brief association with the co-defendant Betancourt, and his lack of any association with the other two co-defendants Rodriguez and Cabrera, demonstrate that the Defendant's participation in this scheme was minor in comparison. The Defendant can be favorably distinguished from the various codefendants in this case based upon his comparatively very short-term involvement in criminal activity and his comparatively long term noteworthy, law-abiding life and lifestyle. The Defendant's strongly favorable personal background and sympathetic personal history stand in marked contrast to the three co-defendants. These factors support a sentencing differentiation between these parties. The Defendant requests the Court to impose a sentence of incarceration dramatically below the advisory guidelines and below the sentence of all the co-defendants. A goal of this memorandum is not to advocate for a long or harsh sentence for the various codefendants but to highlight the many factors justifying a much lower sentence for the Defendant than for any of his three codefendants.

For the foregoing reasons, the Defendant requests a non-guidelines sentence.  Given that the guidelines calculate a life sentence, the Defendant is completely at the Court's mercy.  The Defendant argues that under the particular facts and totality of circumstances, including the nature of the offense, the history and characteristics of the Defendant, his lack of a criminal history, principles of deterrence and rehabilitation and other grounds of Federal Sentencing, and

with consideration of all the factors listed in 18 USC section 3353(a), including the advisory

Guidelines, the requested variance from the guidelines is appropriate.

**History of the Case**

As succinctly stated by the Court in its Ruling On Motions for Judgment of Acquittal

and/or For New Trial, and as summarized in the PSR, this kidnapping and extortion conspiracy

stemmed from the various defendants scheme to trick people into accompanying them in a

purported taxi, driving the persons from New York to Connecticut, and demanding payment

from the person's family members. Specifically, one or more of the defendants/co-conspirators

waiting at the Port Authority Bus Terminal identified undocumented, Spanish-speaking

immigrants. One or more of the defendants/co-conspirators then approached the identified,

undocumented, Spanish-speaking immigrants and either misinformed them that they had missed

their connecting bus to Connecticut and/or had somehow arrived in the wrong place. One or

more of the defendants then offered to get the targeted immigrants to Connecticut via taxi and

called the immigrants Connecticut relatives to tell them about the travel mishap and informed

them that arrangements were made to get the waylaid immigrant travelers to Connecticut via

taxi, not bus. One or more of the defendants would then purport to be a taxi driver and would

drive them to Connecticut and upon arrival at the destination or meeting spot in Connecticut

demand payment from the relatives. Typically, the "taxi fare" was approximately $1000 for the

trip.

As observed by the Court in its ruling, the scheme was hardly intricate or sophisticated.

The undocumented, Spanish-speaking immigrants stood out like sore thumbs in the Port

Authority Terminal. They not only arrived on buses from the Mexico/United States border, they

4

wore electronic bracelets attached to their ankles, held bright yellow envelopes that had the message "I do not speak English. Please help me find my bus." written on it.

As explicitly observed by the Court, in the instances where the targeted victims asked to be let out of the car, the various defendants were convicted of kidnapping and in other instances where the targeted victims did not ask to be let out of the car, the various defendants were not convicted of kidnapping.

Defendant Carlos Hernandez was arrested on December 14, 2016, and has remained incarcerated, in detention at the Wyatt facility. Shortly after the undersigned was retained in March 2017, undersigned counsel and the Government engaged in extensive discussions regarding a pretrial disposition of the case. The Government had early maintained that the Defendant, along with co-defendant Betancourt and others were involved for an extensive period of time preceding the charged incidents of September and October, 2016. The extensive phone records, text messages and other investigative materials, made it as evident that the Defendant was correct in his assertions that he only became acquainted (and subsequently involved) with Betancourt in approximately July 2016. Similarly, it was evident from these same records that the Defendant was never acquainted with, or in contact with, co-defendant Cabrera or co-defendant Rodriguez. The Court is aware that the Defendant has never contended that his admitted actions were either legal or appropriate, but challenged in good faith the applicability of the inveiglement element of the federal kidnapping statute. The Government ultimately prepared and shared a draft plea agreement offer, which if accepted, stipulated to a total offense level of 25, and a guideline range of 51 to 71 months incarceration and one to three years of supervised release. [Appendix I]  The Defendant initially declined the offer, was canvassed by Magistrate Garfinkel in November 2017. Co-defendants Cabrera's and Betancourt's were offered a higher

proposed guideline stipulation. Contrary to the co-defendants Cabrera and Betancourt, the

Defendant through undersigned counsel, requested a reinstatement of the offer and the

opportunity to accept the draft plea agreement before commencement of his trial. The

Government, within their rights, was unwilling to reinstate the offer, and very significantly

increased its offer with a much higher guideline proposal, which was not accepted.

      While not binding on the court, the Defendant would direct the court's attention to the

plea agreement offered by the government wherein Mr. Hernandez was offered a guidelines

range of 57 to 71 months and one to three years of supervised release (see attached plea

agreement).  This offer, in comparison to a life sentence, could not be more disparate.  The

difference in value set on this case before trial by the government, and the guidelines

computation set on this case now after trial, is extreme.

**The Particular Facts Of This Matter, As Related To The Defendant's Conduct, Are Atypical And Are Not Within The "Heartland" Of Cases Encompassed By 18 U.S. Code § 1201**

      As discussed Chapter 1., Part A of the Guidelines Manual: "The Commission intends the

sentencing courts to treat each guideline as carving out a 'heartland, a set of typical cases

embodying the conduct that each guideline describes. When a court finds an atypical case, one to

which a particular guideline linguistically applies, but where conduct significantly differs from

the norm, the court may consider whether a departure is warranted."

      Inveiglement issues where cab or livery drivers are involved are not commonly addressed

at trial or on appeal, and do not often arise in the context of a federal prosecution. Although price

gouging and taking advantage of unsophisticated travelers is prosecuted on a regular basis, that

prosecution is routinely handled in state courts by state prosecutors bringing state charges. This

case presents the rare instance of a federal prosecution where there is no violence, no threat of

violence, no use or display of a weapon, and it is therefore not the expected scenario prosecuted under this statute. The facts alleged in the offenses charged against Carlos Hernandez are at the least aggravated end of the spectrum of conduct encompassed by the kidnapping statute. Although there is a paucity of comparative federal prosecutions, the following two cases illustrate the contention that the guidelines overstate the severity of the offense.

In an analogous case from the Southern District of New York, *United States v. Harbir Parmar*, 7:18cr0877, an Uber driver took a woman from New York City traveling to White Plains but headed toward Boston in an effort to charge her a higher fare. The defendant allegedly groped the victim while she was sleeping and dropped her off in Branford, Connecticut, from where she called the police. The defendant charged the woman $1,047. The defendant was charged with kidnapping and wire fraud. He was sentenced to three years in prison. https://www.nbcnewyork.com/news/local/Uber-Driver-Sentenced-After-Kidnapping-Sleeping-Passenger-511767731.html

In a second analogous case from the Eastern District of California, *United States v. Martin Carranza-Sanchez*, 1:16CR0032-DAD, a defendant posed as a "coyote," an undocumented immigrant smuggler. He held the immigrants ransom until their family members paid him. During the offense, the defendant used threats of violence with a firearm (he put the gun to the immigrant's head) and demanded payment from his captive's family. There were six victims in total and the defendant received a sentence of 6 and a half years. https://www.courthousenews.com/coyote-gets-6-12-years-for-defrauding-immigrants/

A district court has the discretion to consider the sentences of codefendants at sentencing. *United States v. Solomon*, 892 F.3d 273, 278-79 (7th Cir. 2018). "That discretion extends to the situation we face here, where a codefendant or coschemer has not yet

been sentenced but the district court is handling both cases and has enough information before it to compare respective culpabilities." *United States v.* Patel, 921 F.3d 663, 672 (7th Cir. 2019), citing *Solomon, supra* at 279. This Court starts out at a good vantage point from which to address relative levels of culpability, after having presided over a fully contested jury trial. The Court has also sentenced a later arrested co-defendant who, after the jury trial of the defendants, elected to plead. The record reveals several major differences between Hernandez's and the three co-defendants' conduct that warrants a disparity between their respective sentences.

Betancourt, clearly the acknowledged and most significant player, the leader in this scheme, had a much greater level of involvement. He acted as the mastermind of the operation as he was an organizer in the endeavor and was involved in almost every count of the indictment. Well prior to the summer of 2016, and apparently for a long period of time, Betancourt was associated with both Cabrera and Rodriguez. Betancourt only recently recruited Hernandez into the scheme, in July 2016. Hernandez was actually a legally credentialed livery and taxi driver/Uber driver. In comparison to Betancourt, Hernandez proportional culpability is minimal, in scope, duration, initiation, planning, leadership, recruitment and central level of involvement.

Rodriguez was a "predator" of immigrants who had a criminal history of abusing and extorting vulnerable migrants for more than a decade. *Govt. Memo re P. Rodriguez* Doc #304. Rodriguez had a documented history of extorting immigrants in 2005, 2010 and 2015. *Id.*

Cabrera also performed a far more significant and extensive role in the Betancourt's operation than Hernandez. Cabrera was indicted and convicted of more counts involving more victims and more crimes. Cabrera perpetrated additional crimes on his own, without any of the other defendants involved. As noted earlier, Cabrera did not know the Carlos Hernandez at all. [Appendix III, Cabrera 302].

8

Betancourt, Cabrera and Rodriguez were all involved in the "trolling" at the Port Authority Terminal, were all involved in the misrepresentations to the travelers and their respective families, and were in certain instances misrepresenting their status as officials. Carlos Hernandez had no such early direct contact with the arriving travelers or their family members. As the Court may recall, Defendant's two instances were both GPS and partially video-recorded. Again, without implying innocent intent, but for the purpose of contrasting Hernandez's conduct with his respective co-defendants, Hernandez did not travel a long or circuitous route of travel to the ultimate delivery points in Bridgeport and in Milford. Instead, Hernandez drove "as the crow flies" in keeping with traffic times, and displaying his proper licensure. In plain terms, his offense conduct was, in relative degree, considerably less egregious than the conduct the victims of the co-defendants attributed to Betancourt, Cabrera and Rodriguez.

**<u>Nature and Circumstances of the Defendant Carlos Hernandez</u>**

After reviewing the very thorough background investigation contained in Defendant's PRS and reviewing the numerous letters that are being submitted to the Court with this Memorandum, it is difficult to reconcile Carlos Hernandez life from 1962 to the summer of 2016 with the behavior that forms the basis of his convictions. No one could accuse Mr. Hernandez with having been born with a silver spoon in his mouth. The PSR accurately describes his financially challenged and modest family background. Defendant and his many family members corroborate his hardworking family-centric ethic, a man who has always supported his family from childhood through to his arrest. Carlos Hernandez has demonstrated his great love for his children, his elderly parents, and his ailing wife. He has also demonstrated a level of commitment and love of community, serving in the army and national police force of his country of origin for 6 years.

The defendant, Carlos Hernandez, has children, a family and he was the primary provider as he worked as a taxi driver and Uber driver.  Mr. Hernandez had a livery license since 2005 and a taxi license as of 2015. PSR pages 24-25.  He grew up in the Dominican Republic and joined the army at age 18 for four years and thereafter worked in security and police. PSR pages 20-21. He met his wife in 1985, they married in the late 1990s and have two children together, ages 17 and 30.  PSR page 22.  Defendant's wife Francesca remains committed but is struggling to survive financially due to the defendant's incarceration.  PSR page 22.  Hernandez moved to Brooklyn in 1993 and became a naturalized citizen. PSR page 21.

The Appendix is replete with letters from family, former neighbors, friends, from literally all walks of life, including teachers, medical assistants, clergy, civil engineer, attesting to Defendant's commitment to work and family. It is reasonable to look at the defendant's children, the product of his efforts to bring them up to succeed in his chosen country, as a reflection of the better part of the defendant. No one could better describe Defendant than his son Carlos, who in his letter to the Court indicated that "Our family comes from very humble background and my father in order to better this situation journey to this great nation to help propel us forward, working all form of jobs just to provide for his loved ones." The many letters offered in support of Carlos Hernandez depict a kind, law abiding family-man, soldier and policeman, who, until these offenses had never been in trouble with the law.

As the PSR shows, the defendant fully appreciates that his conduct, all of his striving and efforts to do right by his family, were negated by the offenses. As the PSR also shows, the defendant is not only remorseful for his conduct and its effect on the victims, but also its impact upon his family and larger community.  It is appropriate in this context to consider Defendant's individual family circumstances. It is not being overly pessimistic to believe that the defendant's

89 year old father, who has not seen him in three years, and elderly mother, may not have the opportunity to enjoy the comfort of his companionship. Defendant's wife, Francesca, is social security disabled, and suffers from exacerbated orthopedic issues. The reality for Defendant is the fact that his physically disabled wife is in financial straits, depending in large measure on Defendant's son Carlos, who has two under-two year old babies, both born after Defendant's incarceration, one of whom was born prematurely at 24 weeks gestation. Prolonged incarceration creates a greater than normal likelihood of secondary effects given the advanced age and disabilities of Defendant's family.

Defendant suffers from several medical problems, as documented in the PSR, and is being medically treated for depression. Many courts have reasonably observed that incarceration may well have greater significance on those incarcerated for the first time.

In considering the factors related to punishment and general deterrence, the amount of time already served at the Wyatt Detention Facility, Defendant has been incarcerated a month short of three years (December 2016 arrest). The undersigned would suggest to the Court that for first-time offenders, pretrial detention, with its lack of programs, uncertainty of outcome, and a much more restrictive atmosphere, is harder time than typical post-sentencing federal institutions. Very much to his credit, the defendant has been an exemplary inmate under these challenging conditions. It is anticipated that additional documentation regarding Defendant's institutional records will be provided before sentencing. Included in the attached Appendix IV is a letter from Orlando Hernandez of "Voice that Cries in the Wilderness" (prison ministry), attesting to Defendant's significant commitment to Bible services at Wyatt. This letter serves to confirm Defendant's acknowledgement that he needs to address problems that he now better understands. He has demonstrated a positive introspection, as shown in the PSR, into personal

flaws (gambling, overuse of alcohol), and identified a need to become more deeply involved with his church. As depressed and frustrated as he may be under his present circumstances, he focuses on his family's losses and pain, not his own. The Court had the opportunity to see the depth of support and love that Defendant's family exhibited during his trial. That may be one of the strongest predictors of Defendant's ability to resume a productive life as an integral member of his family and the larger community, and live in a wholly lawful manner.

Counsel is not privy to co-defendants' respective PSRs, and only indirectly has acquired any personal information, through published sentencing memoranda. It is submitted that individual characteristics of Hernandez are comparatively favorable to the characteristics of the other three co-defendants. These distinctions go far beyond the simple differences in their respective criminal histories. For example, no family depends on Rodriguez and Rodriguez owes $10,000 in child support; Rodriguez has no anchoring family ties and no employment in America. *Govt. Memo re P. Rodriguez* Doc #304. Again, the Court is in a better vantage point to assess these differences and hopefully conclude that the comparison inures to Carlos Hernandez's benefit. Given Mr. Hernandez's lack of criminal history, in view of his personal and family background, the fact that he supports a family, and other mitigating circumstances discussed herein; a 60 month sentence would advance the principle of parity. 18 U.S.C. § 3553(a)(6) (avoidance of unwarranted disparity). Counsel submits it is reasonable for the Court to find that this case does not fall within the heartland of other inveiglement kidnapping cases, and that in assessing the overall nature and circumstances of this particular defendant's particular conduct, that it is less egregious, slightly more understandable, and warrants a less severe, more compassionate sentence than is urged by the Government.

**CONCLUSION**  The overarching aim of sentencing is to achieve proportionality—that is, we are attempting to impose a punishment that, as the statute expressly mandates, is "sufficient, but not greater than necessary, to comply with the purposes [of criminal sentencing]." § 3553(a) (emphasis added). Consideration of the § 3553(a) factors was required by Congress to achieve this proportionality. The very first factor that Congress instructs judges to consider emphasizes the individual element of the inquiry: "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* Furthermore, the Supreme Court has noted that the Sentencing Guidelines themselves have the fundamental goal of "avoid[ing] excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Booker*, 543 U.S. at 265.

If the Court determines that none of the numerous factors and circumstances highlighted above are individually sufficient to constitute appropriate grounds for departure or a non-guideline sentence, it is respectfully requested that the Court consider the factors and circumstances in deciding whether to downwardly depart or consider a non-guideline sentence. This nearly 57 year old first time offender stands convicted, having already served nearly three actual years of incarceration. He has not only served his family and friends with distinction, he has also served in his former country's military and national police force. He is asking that the Court consider in the balance a half century of blameless life when fashioning a just and proportionate sentence.

Mr. Hernandez requests that this Honorable Court consider all of the facts, circumstances, and information presented in relation to this sentencing and exercise discretion in imposing a fair and just sentence.

THE DEFENDANT,

Date: __11/6/19__                    ___/s/__John R Gulash_____

John R. Gulash ct 05093
Noah J. Kores, ct 29274
Gulash & Associates, LLC
265 Golden Hill Street
P.O. Box 999
Bridgeport, CT 06604
Email: JRGulash@gulashlaw.com
Phone: (203) 870-9944
Fax: (203) 870-9838

## <u>Certificate of Service</u>

I hereby certify that on **November 6, 2019**, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/ JRG_____
John R. Gulash ct 05093