## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:16CR238(SRU) |
| v. | |
| CARLOS HERNANDEZ | November 15, 2019 |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The government respectfully submits this memorandum in aid of sentencing for the sentencing hearing of the defendant Carlos Hernandez, scheduled for November 18, 2019. As explained in further detail below, the United States Sentencing Guidelines calculate that an appropriate sentence for this defendant is life in prison. While the government agrees that this range is more than necessary to sufficiently meet the goals of sentencing, the seriousness of the crime combined with the defendant's failure to appreciate its impact on the victims and acceptance of responsibility and the need to promote respect for the laws of this country warrants a significant sentence of incarceration.

## INTRODUCTION

*This is one of the most serious offenses I've seen as a judge. It involves many, many victims. Those victims were essentially helpless. You preyed on them, preyed on their helplessness, and this was your job… And it's almost unspeakable what you did to these people. You've heard from some of them, and I've heard from others at the trial of your co-defendants, and the fear, the pain, the sacrifice, financial sacrifice that you brought upon them is unconscionable.….[T]he dominant consideration here is the seriousness of the conduct, the wrongfulness of the conduct and the dramatic impact it had on those who were the victims.*

These are the words of this Court at the sentencing of Pascual Rodriguez, the defendant's co-defendant and one of the men who steered victims to others, like the defendant, who would hold the victims captive in cars for hours while negotiating money from the victims' families in

exchange for the victims' safe release. Every single word applies as much to this defendant as it did to Mr. Rodriguez. While the defendant's participation in this kidnapping and extortion scheme was more limited in duration, he was an eager and enthusiastic participant. His conduct was some of the most egregious in this case. The quintessential example of his depravity: he held a six-year-old child in a locked car until the child's family agreed to give him the $700 they had brought with them and agreed to get more.

Moreover, the victims who testified at trial were not the defendant's only victims. An analysis of his phone records shows evidence that, in just six months, he kidnapped seven people, taking several of them in the opposite direction from their final destination. The phone records also show attempts to extort money from another seven people during the same period and calls made from the Port Authority – a place he denies ever going. Contrary to the wishful thinking of his family, the defendant was not duped; he was not tricked into this conduct. He knew what he was doing and did it intentionally to get as much money as he could from his victims, whatever the emotional and financial cost to them.

The defendant's background and history make his crime all the more offensive. He came from a loving, supporting family. He was well-respected in his community. He was formerly a police officer in the Dominican Republic. He did not commit these crimes because he needed money. He committed these crimes because he wanted money. Of all the defendants, he should have known better.

The victims in this case deserve peace. His putative victims deserve to be protected. He deserves a sentence that is in keeping with those this Court has provided to his co-defendants.

These goals can only come from the just punishment of this defendant, which is a sentence substantially more than five years he seeks.

## PROCEDURAL BACKGROUND

The defendant was arrested on December 15, 2016 pursuant to a criminal complaint issued in this District that charged him with conspiracy to commit kidnapping and kidnapping in violation of 18 U.S.C. § 1201(a) and (c). The defendant was presented before Hon. Magistrate Judge William I. Garfinkel on that same date and ordered detained, without prejudice, pursuant to the Government's motion.

On December 22, 2016, a federal grand jury sitting in the District of Connecticut returned a six-count Indictment, charging the defendant and Francisco Betancourt with one count of Conspiracy to Commit Kidnapping in violation of 18 U.S.C. § 1201(c); three counts of Kidnapping in violation of 18 U.S.C. §§ 2 and 1201(a); one count of Conspiracy to Commit Hobbs Act Extortion in violation of 18 U.S.C. § 1951(a); and one count of Hobbs Act Extortion in violation of 18 U.S.C. §§ 2 and 1951(a).

On March 8, 2017, the grand jury returned a Superseding Indictment, charging the defendant and Betancourt with one count of Conspiracy to Commit Kidnapping in violation of 18 U.S.C. § 1201(c); five counts of Kidnapping in violation of 18 U.S.C. §§ 2 and 1201(a); one count of Conspiracy to Commit Hobbs Act Extortion in violation of 18 U.S.C. § 1951(a); and two counts of Hobbs Act Extortion in violation of 18 U.S.C. §§ 2 and 1951(a). That indictment was superseded two more times – on August 2, 2017 and January 17, 2018 – to add two more defendants (Lucilo Cabrera and Pascaul Rodriguez, respectively) and additional counts against them and Betancourt.

3

The trial in this case began on February 26, 2018, and proceeded over ten days during which the government offered testimony from fourteen victim witnesses and four law enforcement witnesses and admitted more than seventy document exhibits that included voluminous cellular telephone records, video surveillance records, GPS records from Immigration Enforcement, bank records, MTA records, and text messages.  The defendants presented no defense case.

At the conclusion of the trial, the jury returned the following guilty verdicts relevant to the defendant:

| Count | Charge | Defendant |
|-------|--------|-----------|
| One | Conspiracy to Commit Kidnapping | All |
| Two | Conspiracy to Commit Extortion | All |
| Three | Kidnapping of Irma Mata-Lopez and aiding and abetting thereof | Betancourt and Hernandez |
| Four | Kidnapping of minor son of Irma Mata-Lopez and aiding and abetting thereof | Betancourt and Hernandez |
| Five | Kidnapping of infant daughter of Irma Mata-Lopez and aiding and abetting thereof | Betancourt and Hernandez |
| Six | Extortion of Dilcia Mata-Lopez and aiding and abetting thereof | Betancourt and Hernandez |
| Nine | Extortion of Dina Velasquez and aiding and abetting thereof | Betancourt and Hernandez |

The jury acquitted the defendants of the remaining counts, all of which alleged substantive kidnapping violations.

The maximum sentence for the substantive and conspiracy counts of kidnapping is life in prison, not more than 5 years supervised release, and a $250,000 fine.  The maximum sentence for the substantive and conspiracy counts of extortion is 20 years in person, not more than three years

supervised release, and a fine of $250,000. A special assessment of $100 per each count of conviction is mandatory, pursuant to 18 U.S.C. § 3013.

U.S. Probation ("USP") calculates the defendant's adjusted sentencing guideline as life in prison. Specifically, pursuant to U.S.S.G. § 3D1.2, USP grouped together those offenses originating out of the same course of conduct with related victims, which in this case resulted in five groups. The first three groups related to the kidnapping convictions, and each group had the same guideline calculation. The defendant's base offense level is 32 pursuant to U.S.S.G. § 2A4.1 because the offense of conviction is kidnapping. That base offense level is adjusted as follows: (1) six points are added pursuant to U.S.S.G. § 2A4.1(b)(1) because the defendant made a ransom demand and (2) two levels are added pursuant to U.S.S.G. § 3A1.1(b)(1) because the victims were vulnerable. Because the defendant was convicted after trial, he does not receive an adjustment for acceptance of responsibility. Thus, the adjusted offense level for Groups one, two, and three is 40.

The remaining two groups related to the defendant's extortion convictions and also had the same guideline calculation. Specifically, the defendant's base offense level is 18 pursuant to U.S.S.G. § 2B3.2(a) because the offense of conviction is extortion. That base offense level should be adjusted as follows: (1) two points are added pursuant to U.S.S.G. § 2A3.2(b)(1) because the offense involved kidnapping; (2) three levels are added pursuant to U.S.S.G. § 2A3.2(b)(3)(B) because the offense involved kidnapping; (3) four levels are added pursuant to U.S.S.G. § 2A3.2(b)(5)(A) because the offense involved abduction; and (4) three levels are added pursuant to U.S.S.G. § 2A3.2(b)(3)(B) because the offense involved kidnapping. Because the defendant was

convicted after trial, he does not receive an adjustment for acceptance of responsibility. Thus, the adjusted offense level for groups four and five is 27.

Pursuant to U.S.S.G. § 3D1.4(a), (b), and (c), USP calculates that the highest offense level is the foundation for the guideline calculation, which here is 40 for the kidnapping units, and three units are added for each of those highest offense level kidnapping groups. Because the extortion groups resulted in an adjusted offense level that is more than nine levels less than the kidnapping groups' adjusted offense level, no units are added for the extortion groups. Thus, the resulting total adjusted offense level is 43. The Government generally concurs with this calculation.[1]

USP calculates that the defendant falls within Criminal History Category I. A total offense level 43, assuming a Criminal History Category I, would result in a range of life imprisonment (sentencing table), a fine range of $50,000 to $250,000, and a supervised release term of two to five years.[2]

## **FACTUAL BACKGROUND**[3]

I. *Crimes of Conviction*

A. *The September 11, 2016 Crimes: Counts One, Two, Three, Four, Five, and Six*

The evidence presented at trial proved that on September 11, 2016, at Port Authority in New York, Betancourt approached Irma Mata-Lopez, her six-year-old son, and her infant daughter, all of whom were from Honduras and traveling in the United States for the first time.

---

[1] The Government believes that the extortion calculation may not be accurate. Specifically, the multiple adjustments for the kidnapping conduct may constitute double counting vis-à-vis each other. Nonetheless, because the removal of these adjustments would result in a lower guideline, it would not change the grouping calculation, in which no points are added to the final adjusted offense level for these groups.

[2] As this sentence exceeds the maximum sentence for the extortion convictions, the defendant's guideline would be 240 months for those convictions. Additionally, for those counts, his supervised release range would be one to three years.

[3] The facts in this section are taken from the PSR, evidence presented at trial, and discovery provided to the defendant.

(Tr. at 50, 66.) Irma and her small children had traveled from Honduras to the American border by car, had been arrested and detained, and then ultimately released to travel to Irma's sister in Connecticut. (Tr. at 50-57.) They had no phone and only $50 in their possession. (Tr. at 60-62, 198-99.) Irma did not speak English and, when she arrived at Port Authority with her children, they had been traveling by bus for several days from the border. (Tr. at 65-66; 198.)

Upon their arrival, a man, who Irma identified as Betancourt, separated her from other passengers, took their bus tickets and told Irma that the bus to Connecticut had already left. (Tr. at 66, 71.) Betancourt told her that he would help her and that he had a taxi. (Tr. at 71.) Betancourt led the family to a train station, holding the hand of Irma's small son. (Tr. at 71-72.) After they exited the train, Betancourt went ahead of her, still holding her son's hand. Irma testified, "He grabbed the hand of 6-year-old boy, and then he walked through some people. I would see him from a distance. I was walking – no running, because I had my little girl in my hands trying to reach him because he had my boy." (Tr. at 75.) She further testified that, at that moment, she felt "worried that maybe I was going to lose my child and that he might want to steal him." (Tr. at 204.)

Once they exited the train station, Betancourt took her to a car and told her "here's the taxi that's going to take you to your destination." (Tr. at 84.) When Irma saw the car, she said "No. I know this is not a taxi. I know what a taxi looks like, and this taxi doesn't have any markings from a taxi." (*Id.*) Despite her protestations, the driver of the car (later identified as Hernandez) "open[ed] the door and then put the boy in. Now you go in." Hernandez then told her "you carry the girl on your legs and put your seat belt on" and told her to "give me the immigration papers so I can look for your sister's address." (Tr. at 85.) Irma did as she was told, and Hernandez kept the

paperwork from that moment on. (Tr. at 85-86.) Both Hernandez and Betancourt then got into the car and they began to drive. (Tr. at 86.) Before heading towards Connecticut, Hernandez dropped off Betancourt. (Tr. 93.)

During the drive, Hernandez received a call from Irma's sister, Dilcia Mata-Lopez ("Dilcia"). Hernandez passed the phone to Irma and told her "just tell her that you're okay, no more." (Tr. at 93.) Hernandez then spoke to Dilcia, and Irma heard him tell her "three fifty per mile" and use "a bad word." (Tr. at 95.) After this conversation, they continued to drive, and Irma testified that they "passed many places that I had already passed when I was on the bus on my way to New York." (Tr. at 96.) The only stop they made was at a gas station, where the defendant only allowed Irma's son to urinate in front the car instead of in the bathroom. (*Id.*)

Irma specifically testified that she asked Hernandez to drop her off. She told him "to let me anywhere, that I would figure out how to call my sister." (Tr. at 98.) But "he said no, I can't leave you. I am responsible for you and your child. I can't do this." (*Id.*) She also testified that she did not ask for a taxi nor did she want to go with either Betancourt or Hernandez. (Tr. at 198.)

When they arrived at the meeting location, Irma exited the car to greet her sister, leaving her son and her immigration paperwork in the car. Dilcia had arrived at the location along with her husband and family friend, Marlon Molestina. When Irma went back to get her son, Hernandez closed and locked the door. (Tr. 99-100.) Dilcia told Irma that she and her infant daughter should get into the car and Dilcia and the men would talk to Hernandez. (Tr. at 101.)

Dilcia testified that on September 11, 2016, she received a call from a person with an unregistered phone number. The person "said that he had my sister. I asked, why? Why was she with him? She was supposed to take a bus to Hartford. He said that the bus didn't arrive, and she

didn't go to the place where she was supposed to go." (Tr. 238-39.) The man further told Dilcia that her family was in a city in upstate New York "very far from the station where she was supposed to arrive." (Tr. at 239; 322.) He told her that he would send Irma and the children in a taxi and that it would cost "three fifty per mile." (*Id*.) Dilcia told him that "it was too much money, that I had no way to pay for it. I said if he could drop her off somewhere where I could pick her up." (*Id*.) The caller stated that he could not give her a pick up location at the moment and that she should wait. (*Id*.)[4]

Dilcia, however, "couldn't wait because I was very worried. She was with an unknown person, and I couldn't wait for that. So I called a friend and asked him where it would be best to pick up my sister." (Tr. at 240.) The friend was Marlon Molestina, who following the phone call, drove Dilcia and her husband and son towards Albany "because it seemed that was closed to the place that [the caller] said he was." (Tr. at 241-42.) Dilcia testified that Marlon drove because she "felt nervous. I felt – I don't even have words how to explain it." (Tr. at 332.) She testified that she feared for the safety of her sister and her family. (Tr. at 333.)

On the way to Albany, Dilcia received a call from another man who was driving her sister. Upon learning that Dilcia was close to Albany, the man told her to turn around and begin driving on Route 15 and terminated the call. (Tr. at 243-44.) Thereafter, he called again and this time allowed Dilcia to speak to her sister. Dilcia testified that Irma told her that she had told the driver to "drop me off somewhere, anyplace where you [Dilcia] can pick me up. I know that he's been driving around just to kill time. He drives around the same places, and he thinks that I don't realize

---

[4] Dilcia described this caller as having a Cuban accent, and stuttering, which is consistent with Betancourt. In addition, Betancourt's picture was captured by Dilcia's phone when he communicated with her through WhatsApp. (Trial Exh. 21.)

he's doing this, but I do." (Tr. at 244.) Dilcia also corroborated her sister's testimony, testifying that her sister had told her subsequently that "she had asked to be dropped off in any place so I could pick her up. He [Hernandez] said no." (Tr. at 331.)

Marlon also testified that during the drive, he realized that the driver was lying about his location and confronted him on the phone. (Tr. at 337.) Marlon told Hernandez to take the next exit off the highway and they would meet him there. (*Id*.) As he testified, "when I arrived over there, I saw the car, so it was like the area was very dark. Across that area was a house, but it doesn't look like no one was over there, and it was kind of strange for me. So I park behind him." (Tr. at 338.)

When they finally arrived at the destination, Marlon spoke to Hernandez about the ride and the cost. (Tr. at 340.) Dilcia greeted her sister, and the driver, who she later identified as Hernandez, told her that she owed him "more than $1000." (Tr. at 246.) When she told him that they did not have that money, Hernandez told her, "I have your sister's documents, and it costs $2,000 to get them from immigration." (*Id*.) Dilcia further testified that when Hernandez "saw that we didn't have the money, he went in the car with the boy and the documents." (Tr. at 247.) Marlon also testified that Hernandez refused to let Irma's son out of the car and that Hernandez stated that it would cost them $2000 to replace the papers he seized. (Tr. at 340-41.) Marlon further testified that he got "kinda upset because I was thinking like a kidnapping, like he was holding the kid." (Tr. at 340.) Marlon that said to Hernandez, "If you don't let him go, you know, let open the door, I will call the cops. At the same time, he say like, 'we don't want to get involved with the cops because they can lose the papers.'…so we negotiate…." (Tr. at 342.) While Marlon testified that he was upset, he also refuted the idea that Hernandez was afraid of him. Specifically, he

testified that Hernandez "wasn't afraid. I'm a very friendly guy. No matter what, I'm tall, big guy, I'm very friendly. I was friendly with him." (Tr. 360.) Marlon reiterated that "we don't look like bad guys. I wasn't intention like to do something to him. I'm not that kind. I'm Christian so…." (Tr. at 367.)

They ultimately offered him $700, but he stated "I need more…we have to find another solution then." (Tr. at 247-48.) At that moment, Dilcia testified that she "felt threatened, and I realized this was not normal. I felt pressured because he had the boy with him." (Tr. At 248.) According to both Dilcia and Marlon, they decided to drive to a 7-Eleven to obtain an additional $100, and after being informed of that decision and paying $700, Hernandez "let the boy go, but he kept the documents, and he said that as long as we didn't give him the money, he was not going to give us the documents." (Tr. at 248-49; 280; 342.)

When they arrived at the convenience store, Dilcia pretended to try to take the money out and told Hernandez she had none to give him. She testified that, at the point, Hernandez "approached me and got close to me. I was very – very afraid. I said to myself, Oh my God, I hope he doesn't pull a gun on me." (Tr. at 249.) Marlon similarly testified that Hernandez was "very close to watching all of the codes or the passwords, wanted to see how much she have in her account." (Tr. at 342-43.) Marlon noted that Hernandez "was using the phone one time talking with somebody I don't know…I feel kind of strange and I'm feeling dangerous, too, because in that time he was speaking with somebody in the dark, all the time the phone he was with the Bluetooth. And after that, he was using the phone in his hands, and I feel like it kind of dangerous for this ladies…. I don't know if he got somebody else follow him or someone closer that can – we can be in danger, and I don't want to put somebody in danger." (Tr. at 343.)

In the end, Dilcia withdrew $100 and give it to Hernandez. (Tr. at 251.) After giving him the money, Hernandez held his phone up to her and told her to tell his boss how much money she had given him. She recognized the voice as being that of the first man who called her that day. (Tr. at 252.) After being paid, Hernandez then gave Irma's documents to her. (*Id*.) Hernandez never returned her bus tickets. (Tr. at 107.)

The government introduced into evidence a surveillance video from the 7-Eleven store where Dilcia withdrew the $100. (Trial Exh. 7 at 2.). On the video, Dilcia and Marlon (wearing a blue shirt with the words "Jesus Strong") can be seen walking into the store. Immediately thereafter, defendant Hernandez is seen walking into the store. Hernandez is visually calm and in control.

The government also introduced evidence from cellular telephones used by Hernandez and Betancourt as well as GPS information from an ankle bracelet provided by Immigration authorities to Irma upon her release from custody. Those records showed that Irma and her children arrived at Port Authority on September 11, 2016, at approximately 4:15 p.m. (Exh. 76 at 9.) Irma and Betancourt then travelled to Brooklyn, where they met Hernandez. (*Id*. at 12.) At approximately 5:26 p.m., all three begin traveling back to Manhattan. Subsequently, only Hernandez and the victims continue to travel to Connecticut. They arrive in Milford, Connecticut after 9:00 p.m. (*Id*. at 24.)

**B.       *The October 21, 2016 Crimes: Counts Two and Nine***

On October 21, 2016, Dina Velasquez anticipated that her cousin, Reyna, and Reyna's child would arrive in Bridgeport, Connecticut by bus from Arizona. (Tr. 873-875.) Reyna and her son, as well as Dina's son, had travelled from Guatemala and crossed the border illegally into

the United States. (Tr. at 811-12.) They were arrested and detained, and then Reyna and her daughter were allowed to travel by bus to the custody of Dina. (*Id*.)

But at 5:00 p.m. on October 21, 2016, Dina received a call from a man who was very hard to understand. (Tr. at 875.) The man "said that he had found Reyna, that he had Reyna, and that she had been left by the bus." (*Id*.) He further stated that "he was a taxicab driver and that if I was in agreement, that he would bring her over." (Tr. at 876.) He told Dina that they were "about five hours away." (Tr. at 878.) However, telephone records associated with Betancourt's phone showed that the phone used to call Dina's phone on October 21 was at Port Authority at the time of the call. (Exh. 76 at 45.) Dina agreed to have her family transported by taxi because "I was worried about [Reyna] her son because she was far away and I didn't know where." (Tr. at 878-79.) At the time that she agreed, she did not know how much the transportation would cost. (Tr. at 879.)

Approximately four hours later, Dina received a call from another man, who told her that he was the driver. That man, who Dina later identified as Hernandez, told her that he would charge $2.50 per mile, but failed to tell her how much the trip would cost in total. At that point, Dina believed that the trip would cost "some $200 or $300." (Tr. at 881.) About an hour later, the same man called her again and told her that he was ten minutes away from her home and that she had to be there to collect her family. (Tr. at 882-83.)

When Dina got to her home, she testified that "it turns out that I was expecting to see a taxi, but instead I saw a van. So I started getting closer to see if that was her or what was it. So little by little I start getting closer, and then he slowly brought down the windows and told me that Reyna was with him….I couldn't see her because he brought in the back" and she could not see through the van's tinted windows. (Tr. at 883.) Dina then tried to open the door, "but he didn't

want that.  So instead he put down the window…so I talked to her. I saw her and I said hi to her."
At that point, Hernandez told her that cost of the trip was "$1,800." (Tr. at 884.)

When Dina told Hernandez that she did not have that much money, he told her that "I had
to find it, I have to borrow it or find someone to loan it to me. So I went to the neighbor to see if
he could let me borrow money." (Tr. at 885.)  Ultimately, Dina offered Hernandez $1000 and still
he asked for more. (Tr. at 886.) He suggested that Dina drive to a bank ATM where she could
withdraw more money. (*Id.*) She assented because "he was not letting [Reyna] out and…he could
possibly take her." (Tr. at 887.) When she suggested that she would take her car, Hernandez said,
"no, come with us in this car." (*Id.*) Reyna similarly testified that Dina "had to pay first so I could
get out of the car." (Tr. at 829.) "She asked if I could get out so we could go in her car. He said
'no.'" (*Id.*)

At the bank, Dina struggled with operating the ATM; Hernandez then went with her and
directed her.  The surveillance video from the bank showed Hernandez actually putting Dina's
card into the machine.  Dina testified that she was "nervous" because she could not operate the
ATM and was concerned that she would not get the money out. (Tr. at 925.)  She stated that the
money was important "to let go Reyna and the boy out of the car." (Tr. at 927.) She testified that
"my fear was that he would take Reyna and the child because he wouldn't let them out of the car.
My fear was that he would take them, and who knows where." (Tr. 957.)

In two separate transactions, they withdrew an additional $500 from her account. (Tr. at
888-89.) Hernandez then drove the family back to Dina's neighborhood.  After she paid him
$1,500, Hernandez called his "boss" and told Dina to "tell him that I only gave him $1,000." She
did as she was told and recognized the "boss" as "the same gentleman that had talked to me the

first time when they had Reyna." (Tr. at 890.) Hernandez then handed Reyna her immigration documents and released them about a block from her home.

The government also introduced evidence from cellular telephones used by Hernandez and Betancourt as well as GPS information from an ankle bracelet provided by Immigration authorities to Reyna upon her release from custody. Those records showed that Reyna and her niece arrived at Port Authority on October 21, 2016, at approximately 4:40 p.m. (Exh. 76 at 31.) Once again, Reyna, her niece and Betancourt then travelled to Brooklyn, where they met Hernandez. (*Id*. at 33.) At approximately 5:30 p.m., all three begin traveling back to Manhattan. (*Id*. at 34.) Subsequently, only Hernandez and the victims continue to travel to Connecticut. (*Id*. at 39-42.) They arrive in Bridgeport, Connecticut close to 10:00 p.m. (*Id*. at 42.)

That evidence also showed that Hernandez kept Reyna and her family in Dina's neighborhood for more than twenty minutes before driving to the People's Untied Bank in Fairfield, Connecticut. (*Id*. at 43-44.) Video surveillance from that bank showed that Dina could not operate the ATM and that Hernandez used her card to "assist" her with two withdrawals. (Trial Exh. 10.) The evidence also corroborated Dina testimony that Hernandez made her call Betancourt, as a phone identified as belonging to Hernandez called Betancourt while Hernandez was still holding Reyna. (Exh. 76 at 46.)

### C.    *Text Messages to the Defendant*

The government also introduced a series of text messages extracted from the phones belonging to Betancourt and Cabrera that law enforcement officials seized at the time of their arrests. These messages, exchanged between, *inter alia*, the defendant and Betancourt evidenced their participation in a scheme to kidnap and extort illegal immigrants.

Specifically, late on the night of October 21, 2016 and into the early morning hours of October 22, 2016, which was immediately following Hernandez's extortion of Dina, Betancourt texted Hernandez, who is identified in Betancourt's phone as "Taxy Carli", the following:

> FB: Call me. He/you already came by to talk to me and I want to talk to you about the trip. Call me.
> FB: Carlos, buddy, where are you
> FB: Carlos, a man's word is worth a lot and commitments are commitments. If you know that you got off work and any man arrange the trip and then eat, play, do what you want. It's coming up on 1 at dawn. What time can I expect you. Call me because nobody remembers the telephone.
> FB: I'm waiting for you, let me know whether you're going to come by here.

(Exh. 59B at 1.)

## DISCUSSION

### A.   *Sentencing Standards*

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed must be reached through consideration of the advisory Guidelines and all of the factors identified in 18 U.S.C. § 3553(a).   In so doing, the Court has a statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)).

The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. §3553 including, but not limited to "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed -- (A) to reflect the

16

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; ... (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." Accordingly, in determining an appropriate sentence for the defendant, the Court must take into account *all* of the factors delineated in Section 3553.

**B.     *Applying These Factors, a Significant Sentence of Incarceration is Warranted***

While the government acknowledges that a life sentence is greater than necessary to achieve the goals of sentencing, a sentence greater than 135 months in prison is necessary to punish the defendant, protect the public, promote respect for the law, and avoid unwanted sentencing disparities.

As the government has repeatedly argued and as this Court has explicitly held, the defendant's crime is not solely a fraud; it was kidnapping and extortion.[5]   The defendant intentionally and knowingly held these victims against their will.  Irma repeatedly asked to be released from his car. The defendant refused.  He forced her six-year-old son to urinate in public rather than allow him and his mother to walk 60 yards to a convenience store bathroom.  He did this so that he could maintain control over his victims.  When they arrived at the meet location, he

---

[5] In support of his argument that a five-year sentence would be appropriate in this case, the defendant cites *United States v. Carranza-Sanchez*.  That case is inapposite.  Unlike this defendant, the defendant in that case was convicted not of kidnapping, but of wire fraud.  The top of his guideline range for that count of conviction was 33 months in prison.

held that child in a locked car until his family agreed to pay him more than the $700 they had on their person. Even when confronted with an accusation of kidnapping, he did not relent. As the defendant held the six-year-old boy in the locked car, Martin Molestina, who had come with Irma's family to pick her up, told him to release the child and stated that he would call the police because this was kidnapping. Hernandez did not flinch; he told Mr. Molestina to stop bluffing; they all knew that no one was calling the police; no one was going to risk such a call because it would draw attention to Irma and her children and could negatively affect their chances of remaining in the country. The defendant only released the child when they agreed to give him more than $700.

After being expressly told that his actions constituted kidnapping, the defendant did it again. He held Reyna and her daughter in a locked car and refused to release her, despite her attempts to exit the car once they arrived in Norwalk and Dina's attempts to open the door. He held this family against their will while he forced Dina to beg her neighbors for money. Dina was fortunate: her neighbors loaned her several hundred dollars. But that was enough for the defendant. He forced her to go to a bank and literally stood over her as she took out more money from the ATM. This was money that the family could not afford to spare, but Dina gave it to the defendant because she was afraid "that he would take Reyna and the child because he wouldn't let them out of the car. My fear was that he would take them, and who knows where."

Each of the defendant's victims have talked about the pain that he caused them. Repeatedly, they have detailed the same experience: insomnia, paranoia, living in constant fear, and a failure to feel stable. The government hopes that the victims can overcome this trauma. But the reality is that years after the fact, the victims still suffer. They remain afraid.

And the people from whom this Court has heard are the victims heroic and courageous enough to speak out. The reality is that they are not the defendant's only victims. Like his co-conspirators, the defendant's phone records show a pattern of abuse. They show blocked calls and travel to the destination of those calls. While not as extensive as his co-defendants in duration, there is no question that the defendant was neck-deep in this conspiracy. As this Court noted at the sentencing of one of the defendant's co-conspirators, "the victims we have here are the tip of the iceberg" and the defendant's conduct "was not a random event or series of events."[6]

The defendant's conduct was just as reprehensible as that of his co-defendants Pascaul Rodriguez and Francisco Betancourt, who this Court sentenced to 135-months and 168-months in prison, respectively. Contrary to his arguments, this was not a hierarchical organization. Each person served their own function, working together with a collective understanding as reflected by their electronic communications. Typically, one defendant would steer the victim and another would drive them. Both extorted the families. There is no "leader" among these defendants; there is simply a band of men looking to victimize people.

In response to these facts, the defendant makes three mitigation arguments: (1) the ransom enhancement is not appropriate; (2) he is a good person with no criminal history; and (3) he suffered from a gambling addiction. With respect to the first argument, the defendant offered no additional rationale beyond that presented by his co-defendant Betancourt. This Court firmly rejected that argument during Betancourt's sentencing, and should do so again for the reasons

---

[6] In this regard, the case of *United States v. Parmar*, cited by the defendant, is also distinguishable from the instant case. There, the defendant Uber driver had long engaged in fraudulent conduct, but had never previously held an individual against their will; the conviction represented the one and only time in which the defendant had kidnapped a victim.

articulated in the government's sentencing memorandum for Betancourt's sentencing hearing and by the Court at that hearing.

The remaining arguments are equally unavailing. The defendant's lack of a prior criminal record makes his enthusiastic participation in the instant crime more sinister, not less. The defendant claims to be a Christian and a former police officer. Yet he preyed on vulnerable people – many of whom were families with small children – without care or concern for their welfare and well-being. They were chattel. They were means to an end. That end appears to be getting money so that he could gamble. But that is not a recognized basis for a departure from the sentencing guidelines. *See United States v. Choi*, 272 Fed.Appx. 133, 134 (2d Cir. 2008)(citing U.S.S.G. § 5H1.4 for the proposition that "an asserted 'gambling addiction is not a reason for a downward departure'"); *United States v. Grillo*, 111 Fed.Appx. 631, 633 (2d Cir. 2004) (upholding the rejection of a downward departure on the basis of a gambling addiction). Moreover, given his family and the support of his community, there is no justification for his failure to turn to them for help. There is no excuse for his repeated victimization of the most vulnerable within our society. In the words of this Court, "shame on you."

Like his co-defendants, Mr. Hernandez should receive a substantial sentence, one that is greater than 135-months in prison. Such a sentence is in keeping with the sentences of his co-defendants. Such a sentence communicates to the world that all people have value and deserve protection. It tells those who would minimize this conduct – as the defendant does – that it is serious, reprehensible, and deserving of punishment.

## CONCLUSION

As detailed above, the offense in this case is serious and the Court's sentence must address that sentencing factor as well as the need to protect the public, promote respect for the law and afford adequate general deterrence to criminal conduct. Thus, the United States respectfully requests that the Court take notice of the foregoing and impose an appropriate sentence.

Dated: November 15, 2019
      Bridgeport, CT

<div style="margin-left: 40%">

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY
By: **/s/**
VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY
Bar Number: PHV 05095
UNITED STATES ATTORNEY'S OFFICE
1000 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
(203) 696-3016
Vanessa.richards@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

      I hereby certify that on November 15, 2019, a copy of the above submission was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

**/s/**
VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY
PHV 05095
(203) 696-3000